**HALL v. JOHNSTON, Warden.**
**No. 22449–S.**

District Court, N. D. California, S. D.
Sept. 11, 1939.

Stephen M. White, of San Francisco, Cal., for petitioner.

Frank J. Hennessy, U. S. Atty., Robert B. McMillan and A. J. Zirpoli, Asst. U. S. Attys., all of San Francisco, Cal., for the Government.

ST. SURE, District Judge.

This is the second application made by petitioner in which he seeks discharge on the ground that he was insane at the time of his arraignment, plea of guilty and sentence before the District Court of the United States for the Western District of Missouri, hereinafter referred to as the trial Court. The first application was made in case number 22238-R. The petition was denied by District Judge Michael J. Roche, whose order was affirmed by the Circuit Court of Appeals in the case of Hall v. Johnston, 9 Cir., 86 F.2d 820, 821. The Court there said: "It is, of course, fundamental that a writ of habeas corpus cannot take the place of a writ of error. Whether the appellant was insane at the time of the commission of the offense or at the time of trial was a matter of defense, if the court had jurisdiction to determine the issue. As against collateral attack, the judgment is valid unless the contrary appears in the record, and omission in the record of every step in the proceeding does not overcome the presumption of regularity and warrant release on a writ of habeas corpus. Archer, Warden, v. Heath [9 Cir.], 30 F.2d 932."

Petitioner again made application for a writ of habeas corpus in the present proceeding, alleging as in his first petition, not only that he was insane at the time of his arraignment before the trial Court, but, in addition, *that the trial Court, with knowledge of his insane condition, ordered petitioner to be arraigned and plead without an attorney.* This Court denied the petition without the issuance of an order to show cause and on appeal, the Circuit Court of appeals reversed and remanded the case, and directed that an order to show cause issue. In reversing this Court, the Circuit Court of Appeals said:

"Here the fact alleged is that the court, having knowledge of the need of the prisoner for counsel to present his defense of insanity, and knowledge that he was claimed to be insane, failed to furnish counsel for the presentation of such defense.

\* \* \*

"It is this knowledge which is essential to bring the petitioner's case within the decision of Mooney v. Holohan, 294 U.S. 103, 110, et seq., 55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.A. 406.

\* \* \*

"The gravamen of the offense claimed in the Mooney Case is the knowledge resting in the mind of the District Attorney which he failed to exercise in the course of the trial for the benefit of the accused.

"Here the charge is that the judge, having knowledge of a condition requiring the presence of counsel for the protection of the accused, failed to exercise that knowledge and proceed upon it to appoint counsel.

\* \* \*

"In the ordinary criminal proceeding insanity is a defense. The writ of habeas corpus is not available to show that the defense was not waived by a plea of guilty or to raise the question, where there was a trial, and the defense was either waived or decided adversely to the accused. Hall v. Johnston, supra. Here, however, we have the different element described above.

"The District Court should issue an order to the warden to show cause why the writ should not issue. If requested, we suggest the appointment of counsel for the petitioner."

Hall v. Johnston, 9 Cir., 91 F.2d 363, 364.

After remand this Court appointed Stephen M. White, Esq., to represent petitioner, and issued an order to show cause, to which respondent filed a return. This was followed by the issuance of a Writ of Habeas Corpus, on which a hearing was had and in which there was introduced in evidence the deposition of petitioner taken at Alcatraz, California, the depositions of other persons taken in West Virginia and

Missouri, and also certain other documents and writings. The matter was then submitted, and after considering the evidence and hearing argument of · counsel, this Court discharged the Writ and remanded petitioner to the custody of respondent. Again petitioner took an appeal and again the Circuit Court of Appeals remanded the case to this Court, saying: "It is thus apparent that the appellant concedes that he waived counsel but claims that he was not competent to do so. In view of the fact that the trial court did not expressly pass upon the mental capacity of the appellant at the time he waived counsel, the case is remanded to the trial court for findings as to whether or not the appellant was of sufficiently sound mind at the time of his arraignment to understand that he was waiving his right to the assistance of counsel." Hall v. Johnston, 9 Cir., 103 F.2d 900, 901.

■ Since this is a collateral attack upon the validity of the arraignment and the jurisdiction of the trial Court to proceed to render judgment against petitioner, *the burden of establishing that the petitioner was not of sound mind at the time of his arraignment by the trial Court rests upon petitioner.* Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; Buckner v. Hudspeth, decided by the Tenth Circuit Court of Appeals on June 20, 1939, 105 F.2d 396.

It is true that on May 1, 1934, Hall was adjudged a lunatic, that he was paroled from the Spencer State Hospital of West Virginia on August 4, 1934, and was automatically discharged from that institution on August 4, 1935. And while this proof standing alone tends to overcome the presumption that the accused was sane, nevertheless all the other evidence in the case shows that petitioner intelligently understood and appreciated the meaning and consequence of his acts.

Other than the general and uncorroborated statement of Hall that it was a case of dementia praecox, there is no proof whatsoever as to the character of his insanity at the time of his commitment to the West Virginia Spencer State Hospital on May 1, 1934, or as to the duration thereof. The letter of the Superintendent of the Hospital, recently affixed to Petitioner's memorandum as Exhibit II, sheds no light whatsoever on the question. The petitioner appeared to have sufficiently improved in his condition within three months to per-mit his release on parole, and while his automatic discharge did not become effective until one year later, nevertheless there is no proof that he was still insane at the time of his parole or that his insanity continued until his discharge. The only reasonable inference to be drawn from these facts is that his condition had sufficiently improved to justify his release on parole on August 4, 1934, and that after one year, no cause appearing to revoke his parole, his discharge became automatic.

■ Petitioner further relies upon the fact that his present condition has been diagnosed as Parkinson's disease and that a similar diagnosis was made while he was in the psychopathic ward at the Atlanta Penitentiary in 1933. No proof is offered as to the effect of said disease on his mental faculties and this Court can not indulge in any presumption or inference that this disease affected his intellect.

All of the affidavits and depositions submitted by the respondent indicate that his answers to questions were responsive, his conversation intelligent, and that there was nothing about his actions, condition or conversation which might indicate insanity.

The certificate of Judge Reeves, the trial judge, says in part:

"Some one stated to me at the time that the defendant Hall was suffering from an impairment of his right arm, presumably from neuritis or a form of paralysis. This statement was disputed at the time by the District Attorney.

"My observation of the movements of the defendant confirmed what the District Attorney told me. Neither at the time the plea was entered, nor at any other time, was any suggestion made that the defendant was afflicted with insanity, or that he was incapacitated for entering his plea.

"After the plea was entered I inquired of him if he had any statement to make relative to his very unusual conduct and crime, whereupon he merely asked for leniency. He did not endeavor to justify his offense, and offered no excuse whatever for the deceptive manner in which he got into prison and supplied firearms to the defective inmates.

"One of the assistant district attorneys called my attention to the statement that I was advised of the defendant's mental infirmity and declined to appoint counsel for him. These statements are untrue;

the contentions being made are merely afterthoughts and wholly baseless."

The deposition of Deputy United States Marshal Finley Cook, who arrested Hall and interviewed him at length, recites in part:

"Q. No. 5. Did you see him after his arrest? A. I did.

"Q. No. 6. Where and under what circumstances? A. At the Kanawha County Jail during the latter part of August, 1934. Department of Justice Agent, William H. Heywood, and I went down to question him, routine questions about the crime and waiving extradition to the state and district wherein he was wanted for a federal crime.

"Q. No. 7. Do you remember about how long that interview lasted? A. To the best of my recollection it was something like an hour or an hour and a half.

"Q. No. 8. Did you and Special Agent Heywood talk to Hall during that time? A. We did.

"Q. No. 9. Will you tell us what his physical condition was as you observed it at that time? A. He had an impediment in his speech and, to the best of my recollection, he could just barely walk and had some defect in his arm. It was crippled and I don't know whether he was paralyzed or what was wrong.

"Q. No. 10. Were his answers to your questions responsive? A. Yes, they were. They were pretty hard to understand but they were in answer to the questions.

"Q. No. 11. I believe at that time he signed a Waiver for his removal to Missouri. A. Yes, sir. He did.

"Q. No. 12. Did you know at that time whether or not Hall was sane or insane? A. We thought he was sane, but pretending to be in worse shape than he was.

* * *

"Q. No. 15. At that time did you believe him sane? A. Yes.

"Q. No. 16. Was there anything particularly about his actions, condition or conversation which you noticed which might indicate sanity or insanity? A. Well, he made sane answers to our questions but it seemed that the only ailment he had was his physical ailment, and not mental.

"Q. No. 17. What were those physical ailments? A. Apparently a partially paralyzed tongue, and his arm was paralyzed.

I believe he was taking some pills that seemed to relieve him of spells he would have of slobbering, due to the fact that he could not swallow his saliva."

The deposition of United States Marshal John H. Bowling, who was with Hall for several hours, recites in part:

"Q. No. 3. Do you remember the occasion upon which H. Karl Hall was arrested in the Southern District of West Virginia? A. I do. He was arrested by County authorities and placed in the Monroe County Jail. I took him from Monroe County Jail on August 22, 1934, on a fugitive warrant and took him to the Greenbrier County Jail at Lewisburg, where I left him until August 23, 1934, at which time I took him to Charleston to the United States Marshal's office. W. H. Heywood, Special Agent of the Federal Bureau of Investigation, questioned him in the Marshal's office and a doctor, whose name I do not remember, was called to examine him and pronounced him able to make the trip to Missouri.

"Q. No. 4. Was Hall arrested by Monroe County, West Virginia authorities on a state or federal charge? A. On a State charge having no connection with the federal offense for which he was later removed to Missouri.

"Q. No. 5. Will you tell us what his physical condition was as you observed it at that time? A. He was weak physically, was able to walk alright. One arm had something wrong with it and he requested soft boiled eggs for lunch on account of his stomach. He talked very low, you could scarcely hear him. There was something wrong with his speech which made it difficult to understand him. He talked to me practically all the way down from Lewisburg to Charleston, which is over a hundred miles, about different subjects which we were both acquainted with including criminal friends he had made while in the United States Penitentiary, Atlanta, Georgia.

"Q. No. 6. Were his answers responsive to your questions and was his conversation intelligent? A. They were only his speech was not plain and I couldn't understand all of his conversation. Such of his speech as I could hear was intelligent.

"Q. No. 7. Did you believe this man to be sane at the time of his arrest? A. Yes.

"Q. No. 8. Did Hall tell you that he had been adjudged insane at any time? A. He did. He told me about holding up this bank with a hatchet and was adjudged insane by the Monroe County, West Virginia, Lunacy Commission and committed to the State Hospital at Spencer, West Virginia, from which he had been released on bond."

Furthermore, there is evidence in the record indicating that this claim of insanity about which the trial Court had no knowledge was feigned insanity. Deputy United States Marshal Finley Cook testified as follows:

"Q. No. 13. Did he (Hall) tell you anything in regard to his sanity or insanity? A. Yes, he told us that he had been in the State Hospital for Insane at Spencer, West Virginia, prior to his arrest in Monroe County on this charge.

"Q. No. 14. Did he give you any reason for his being in Spencer State Hospital? A. To the best of my recollection, he said his sister had him sent there to avoid prosecution on another charge, or words to that effect."

That insanity was feigned is further shown by a letter Hall caused to be smuggled into the Federal Hospital for Defective Delinquents at Springfield, Missouri. That letter sent to Anthony Owens, a prisoner, whom Hall had previously endeavored to assist in escaping for which offense he is serving his present sentence, was sent by him only nineteen days after he had been committed to the Spencer State Hospital. It reads:
"Dear Anthony:

"I guess my partner has written you before this about my little difficulty which has landed me in this hospital, where I do not think I will be but a few weeks. However, if you want any business attended to in the east you may call on my partner who can be relied upon in every way. He is entirely in my confidence. He was with me out there in November. His address: G. H. Duling, Enon, W. Va.

"With best wishes, I remain

"Sincerely,

"H. Karl Hall."

■ Pursuant to said mandate, this Court now finds:

(1) That petitioner has not sustained the burden of proving that he was not of sufficiently sound mind at the time of his arraignment to understand that he was waiving his right to the assistance of counsel; and

(2) That petitioner was of sufficiently sound mind at the time of his arraignment before the trial Court to know that he was waiving his right of assistance of counsel.

It is therefore ordered that the Petition for writ of habeas corpus be, and it is hereby denied.